UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION


CAREMARK, INC.                          )
                                        )
v.                                      )          No. 3:04-01112
                                        )          JUDGE CAMPBELL
DAVID GOETZ, et al.                     )
                                        )
v.                                      )
                                        )
UNITED STATES OF AMERICA                )


MEMORANDUM

I. Introduction

Pending before the Court are Defendants' Motion For Summary Judgment (Docket No.

68), filed by the State of Tennessee Defendants; Caremark's Cross Motion For Summary

Judgment (Docket No. 72); the United States' Motion for Summary Judgment Or, In The

Alternative, To Dismiss Or Transfer (Docket No. 80); Joint Motion For Hearing On The Parties'

Cross Motions For Summary Judgment (attached to Docket No. 79); Motion for Leave to File

Amicus Curiae Brief In Support Of The United States' Opposition To Caremark's Motion For

Summary Judgment, filed by Janaki Ramadoss (Docket No. 94); and Motion For Leave To File

Ramadoss' Reply To Caremark's Response In Opposition To Her Motion For Leave To File An

Amicus Brief (Docket No. 105).

The Motion for Leave to File Amicus Curiae Brief In Support Of The United States'

Opposition To Caremark's Motion For Summary Judgment, filed by Janaki Ramadoss (Docket

No. 94); and Motion For Leave To File Ramadoss' Reply To Caremark's Response In

Opposition to Her Motion For Leave To File An Amicus Brief (Docket No. 105) are

GRANTED.

As the Court finds oral argument unnecessary, the Joint Motion For Hearing On The Parties' Cross Motions For Summary Judgment (attached to Docket No. 79) is DENIED.

For the reasons set forth below, Defendants' Motion For Summary Judgment (Docket No. 68), filed by the State of Tennessee Defendants is GRANTED; Caremark's Cross Motion For Summary Judgment (Docket No. 72) is DENIED; and the United States' Motion for Summary Judgment Or, In The Alternative, To Dismiss Or Transfer (Docket No. 80) is GRANTED.

## II. Factual and Procedural Background

Caremark filed this declaratory judgment action seeking judgment as to whether certain pharmacy benefit plan limitations are enforceable with respect to third party liability claims asserted by TennCare for Medicaid reimbursement. (Complaint For Declaratory And Injunctive Relief (Docket No. 1)). Named as Defendants are David Goetz, Commissioner of the State of Tennessee Department of Finance and Administration, and Jason D. Hickey, Deputy Commissioner of the Bureau of TennCare. (Id.) The United States subsequently filed a motion to intervene in the case, which was granted by the Court. (Docket No. 53). The United States also sought dismissal of the case, or transfer to the Western District of Texas, which the Court denied. (Id.)

The parties have stipulated to the following undisputed material facts (Docket No. 71):

### Parties

1.      Plaintiff Caremark Inc. (Caremark) is a pharmaceutical services company. Caremark's principal place of business is at 2211 Sanders Road, Northbrook, Illinois. Caremark

2

Inc. is a wholly-owned subsidiary of Caremark Rx, Inc., whose offices and senior management are located in Nashville, Tennessee. Among Caremark's customers are insurance companies, managed care organizations, and public and private health plans and programs, including employee benefit plans subject to the Employee Retirement Income Security Act (ERISA), 29 U.S.C. §§ 1001 - 1461. Among other things, Caremark dispenses prescription drugs to eligible participants in benefit plans. Caremark asserts that these plans are created by its customers and these customers are ultimately responsible for any amounts due to TennCare. Caremark's services are generally referred to as pharmacy benefit management ("PBM") services.

2.     Defendant David Goetz is the Commissioner of the Tennessee Department of Finance and Administration. The Department of Finance and Administration acts as the chief corporate office of Tennessee state government. It administers the State's TennCare program and contracts with the Tennessee Department of Human Services to determine eligibility for more than 40 different Medicaid-eligible groups.

3.     Defendant Jason D. (J.D.) Hickey is the Deputy Commissioner of the Tennessee Department of Finance and Administration and as such oversees the Bureau of TennCare. He supervises the day-to-day operations of the state Medicaid program and TennCare. TennCare is Tennessee's managed healthcare program. TennCare provides healthcare coverage to individuals eligible for Medicaid benefits as well as individuals who are determined to be uninsured or uninsurable. TennCare sends reimbursement requests to Caremark seeking reimbursement for Medicaid expenditure for individuals who have pharmacy benefits under healthcare plans of Caremark's customers.

<u>Background</u>

3

<u>Medicaid</u>

4.      Medicaid is a program, created under Title XIX of the Social Security Act, that pays for medical and health-related assistance for certain vulnerable and needy individuals and families. See 28 U.S.C. § 1396, et seq. This program became law in 1965. The Medicaid program is a joint federal-state program. 42 U.S.C. § 1396(b). It is administered by the States but financed with State and Federal funds. Medicaid is the largest source of funding for medical and health-related services for people with limited income. The Federal Government provides 50 to 83 percent of the funding depending on the State's per capita income.

5.      Some Medicaid beneficiaries may also have coverage through health benefit plans administered by Caremark. This additional coverage often occurs through employment-related health benefits offered to them or to a relative. Individuals who have coverage under both Medicaid and some other source are often referred to in this matter as "dual eligibles." The term "dual eligibles" in this context means persons with coverage under Medicaid and coverage through some other health benefit plan administered by Caremark, and does not mean persons eligible for both Medicaid and Medicare, as the term is sometimes used.

6.      Unless otherwise provided by Federal law, Medicaid is considered to be the payor of last resort, meaning that its coverage is deemed secondary to any other health care coverage that a Medicaid beneficiary may have. See, 42 U.S.C. § 1396k (recipients of Medicaid assign rights to payment for medical care to the government). Medicaid refers to other insurers and benefit plans as "third parties" and refers to claims for reimbursement of Medicaid benefits paid on behalf of Medicaid beneficiaries as "third party claims."

7.      Federal law requires every participating state to implement a "third party

4

liability" provision which requires the state to seek reimbursement for medicaid expenditures from third parties who are liable for medical treatment provided to a Medicaid recipient. 42 U.S.C. § 1396(a)(25). A State plan must also provide that, as a pre-requisite to Medicaid eligibility, the applicant assign to the state whatever rights he may have to payment for medical care. 42 U.S.C. § 1396k(a)(1))(A).

8.      42 U.S.C. § 1396a sets forth in detail certain mandatory features of any State plan seeking approval to participate in the federally-funded Medicaid program. Tennessee has submitted to the Secretary of HHS a "plan ...for pursuing claims against third parties" as required by 42 U.S.C. § 1396(a)(25)(ii).

9.      Pharmaceutical costs are often covered by third party benefit and insurance plans, and state Medicaid agencies regularly request reimbursement for pharmaceutical costs paid out on behalf of dual eligibles.

10.      A typical third party liability pharmacy claim arises when a "dual eligible" goes to a retail pharmacy to have a prescription filled. At the point of sale, this individual presents only his Medicaid card, and does not disclose the existence of other insurance (perhaps because he is unaware of his private coverage, or perhaps because his Medicaid coverage requires a lower co-pay from him). The pharmacy accepts the Medicaid card and sends a claim to the state Medicaid agency for payment. The Medicaid agency then pays the pharmacy's claim. When the Medicaid agency, in this case TennCare, discovers dual coverage after payment, a request for reimbursement is sent to the third party.

11.      In accordance with Federal law, Medicaid beneficiaries assign to the Medicaid agency their rights to payment for medical care from any third party. 42 U.S.C. §1396k(a)(1)(A);

5

42 CFR 433.145. Federal law also requires group health plans to "provide that payment for benefits with respect to a participant will be made in accordance with any assignment of rights made by or on behalf of such participant or beneficiary of the participant." 29 U.S.C. § 1169(b)(1).

12.     In keeping with Federal law, Tennessee law provides that "the state shall be subrogated to all rights of recovery ..." that Medicaid recipients may have against any third parties, and that upon "accepting medical assistance, the recipient shall be deemed to have made an assignment to the State of the right of third party insurance benefits to which the recipient may be entitled." T.C.A. § 71-5-117(a) and (b).

13.     Tennessee law also authorizes TennCare to seek reimbursement from such third parties. Tenn. Comp. R. & Regs. 1200-13-1-.04.(6).

14.     Whenever a Medicaid agency establishes the "probable existence" of third party liability at the time a claim for medical services is filed, the agency must reject the claim and return it to the provider for a determination of the amount of liability. 42 C.F.R. § 433.139(b)(1). This is called "cost-avoidance" because it "avoids" the cost to Medicaid by preventing a claim from being paid by Medicaid in the first place.

15.     If the probable existence of third party liability cannot be established or third party benefits are not available to pay the recipient's medical expenses at the time the claim is filed, the agency must pay the full amount allowed under the agency's payment schedule. 42 C.F.R. § 433.139(c).

16.     If the Medicaid agency is unaware of third party liability, the agency must immediately pay the claims upon receipt and, "if the agency learns of the existence of a liable

6

third party after a claim is paid, or benefits become available from a third party after a claim is paid, the agency must seek recovery of reimbursement. . . . " 42 C.F.R. § 433.139(d)(2).

17.    The process through which Medicaid pays the recipient's bills and then recovers reimbursement from liable third parties is called "pay and chase." By definition, recovery under "pay and chase" can only occur after Medicaid pays for the services. It cannot occur at the point of sale.

18.    If a dual eligible fails to notify the provider of his other coverage, and Medicaid is otherwise unaware of it, Medicaid is required by law to pay the claim and recover reimbursement afterward to the extent of the third party's "legal liability," i.e., Medicaid "pays and chases." 42 U.S.C. § 1396a(a)(25); 42 C.F.R. § 433.139(d)(2).

19.    Tennessee has participated in Medicaid since shortly after the program's inception in the 1960s. Until 1994, Tennessee's Medicaid program operated much like a commercial fee-for-service insurance plan, paying claims directly submitted by healthcare providers who served eligible participants.

20.    In 1993, Tennessee obtained authorization from the U.S. Secretary of Health and Human Services (HHS) under section 1115 of the Social Security Act, 42 U.S.C. § 1315, to permit the State to replace its conventional Medicaid program with a managed care program called TennCare.

21.    Under the terms and conditions of the authorization from HHS, TennCare substantially broadened coverage making eligible many uninsured Tennesseans who would not meet traditional Medicaid criteria. Federal Medicaid funds still account for approximately two-thirds of TennCare's annual budget.

7

<u>Pharmaceutical Benefits Management Industry</u>

22.      PBM companies such as Caremark provide prescription drug distribution and claims processing for the plans they service. In addition to operating its own mail service pharmacies, Caremark has contracted with retail pharmacy chains and independent retail pharmacies to form a network comprised of more than 57,000 retail pharmacies.

23.      As a participant in the healthcare industry, Caremark's operations and relationships are subject to federal and state laws and regulations and enforcement by federal and state governmental agencies. Various federal and state laws and regulations govern the purchase, sale and distribution of prescription drugs and related services, including administration of prescription drug benefits.

<u>Pharmacy Benefit Plan Limitations</u>

24.      Caremark's customers sponsor pharmacy benefit plans that help eligible participants receive medications prescribed by their physicians.

25.      Caremark enters into formal "Prescription Benefit Management Agreements" with its customers in which Caremark agrees to administer the customer's prescription benefit in accordance with the elements of the plans Caremark administers.

26.      There are three pharmacy benefit plan features at issue in this action which can impact the reimbursement of claims made by TennCare to Caremark and/or its customers: (1) the requirement that the eligible plan participant be identified at the point of sale (also known as a "paper claims restriction" or the "Caremark card presentation" requirement); (2) "timely filing" limitations; and (3) "out-of-network" limitations. Caremark contends in this action that these plan limitations are a permissible basis to reject, deny, or reduce reimbursement requested by

8

State Medicaid agencies that pay a claim initially and subsequently bill Caremark or its customer.

27. The requirement that the eligible plan participant be identified at the point of sale (also known as a "card presentation requirement" or a "paper claims benefit" restriction), is a plan provision requiring a person receiving prescription drug benefits under a plan administered by Caremark to be identified as an eligible plan participant at the point of sale when a prescription is filled at a retail pharmacy. A plan beneficiary receiving prescription drugs may identify him/herself as an eligible plan participant by presenting a Caremark card at the point of sale or otherwise providing the retail pharmacy with information that the individual is a participant in a Caremark-administered plan. Caremark-administered plans with this plan limitation may decline to provide their participants with any prescription drug benefits if they fail to identify themselves as a plan participant at the point of sale in order to reduce their costs. However, some plans allow participants to obtain their prescriptions at retail pharmacies without using their Caremark card or otherwise identifying themselves as participants of a Caremark-administered plan at the point of sale. In this instance, the participant pays out of pocket the retail pharmacy's usual and customary rate and then seeks reimbursement from the plan for this expenditure. This plan design feature is sometimes referred to as a "paper claims benefit," in reference to the fact that the participant sends a claim form and/or receipt to Caremark with a request that Caremark calculate the benefit payable by the plan for the prescription filled and remit that amount to the participant. Some plans do not offer their participants a "paper claims benefit." A plan which requires a participant to be identified as a plan beneficiary at the point of service will not reimburse a participant for any cost incurred for prescription drugs if the

9

participant failed to use his Caremark card or otherwise identify him or herself as a plan participant at the point of service. When Medicaid seeks reimbursement for a dual eligible who has not been identified as a beneficiary of a Caremark-administered plan at the point of sale, Caremark will routinely reject a reimbursement request by Medicaid on behalf of plans that require identification of beneficiaries at the point of sale.

28.     The "timely filing" restriction relates to the maximum number of days that a plan participant has to file a claim for reimbursement from the date a prescription is filled by a pharmacy. If applied to Medicaid, a timely filing restriction would require Medicaid to submit its reimbursement claims within this time period in order to receive reimbursement.

29.     The "out-of-network" limitation relates to a customer's network of pharmacies as described in the plan, which includes either Caremark's network of pharmacies or a subset thereof. Caremark establishes a network of pharmacies, which choose to join Caremark's network with the hope that they will receive a greater volume of business from the participants of a Caremark-administered plan. Caremark's customers may choose to make Caremark's entire network of retail pharmacies or a subset thereof available to their participants. Caremark-administered plans with an out-of-network restriction may deny reimbursement if the prescription is filled by a pharmacy that is not part of the customer's network of pharmacies. Alternatively, the benefit plan may provide for a lower rate of reimbursement or a higher co-pay if the prescription is filled by an out-of-network pharmacy.

30.     The March 7, 2004 letter from Caremark to the State of Tennessee titled

10

"Stipulations of Law by Caremark" is incorporated hereby by reference.[1]

The Stipulations of Law by Caremark, referenced above, are as follows:

"Medicaid" is a joint federal-state program enacted under Title XIX of the Social Security Act of 1965, 42 U.S.C. §§ 1396, *et seq.* In Tennessee, Medicaid was renamed as the "TennCare Program" pursuant to a waiver granted by the Health Care Financing Administration (now known as the Center for Medicare and Medicaid Services) under Section 1915 of the Social Security Act. Hereinafter, the term "medicaid" includes in all respects the TennCare program whether administered by the State of Tennessee or any of its duly authorized agents and contractors. No distinction between Medicaid and TennCare is meant or intended herein.

Caremark acknowledges that many of its customers' plans are governed by the Employee Retirement Income Security Act of 1974, commonly known as ERISA, *see* Publ. L. No. 93-406, 88 Stat. 829 (codified at 29 U.S.C. §§ 1001 *et seq.*), and further that with the enactment of ERISA § 609(b), Congress required ERISA-governed plans to include specific provisions honoring the assignment of rights Medicaid recipients make by law to Medicaid. Caremark agrees that it cannot and should not deny Medicaid claims based upon any provisions in a customer's plan that specifically prohibit an assignment of rights.

Caremark further acknowledges that it cannot deny or reduce payment of a Medicaid claim on the basis of "out-of-network" simply because it is a Medicaid claim and the responsible plan does not recognize the various NABP codes created by Caremark to identify a claim as

_____

[1] Caremark also stipulates that attached to the Stipulations as Exhibit A is a true and authentic copy of a document dated January 19, 2005 that Caremark received from the Centers for Medicare and Medicaid Services.

11

being from Medicaid (namely "9999991", "9999999", and "6666666") as being included in its pharmacy network.  In other words, Caremark acknowledges that a Medicaid claim cannot be denied or reduced as "out-of-network" simply because it is a Medicaid claim.

III.  <u>Analysis</u>

A.  <u>Declaratory Judgment Action</u>

The Defendants have not argued in their pending motions that the Court should not exercise jurisdiction under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq.,* to decide the issues raised. In any event, the Court concludes that this is an appropriate case for the exercise of its discretion to issue a declaratory judgment because the judgment will settle the controversy as to the issues raised and would clarify the legal relations at issue. <u>See</u> <u>Foundation for Interior Design Educ. Research v. Savannah College of Art & Design,</u> 244 F.3d 521, 526 (6th Cir. 2001)(citing <u>Scottsdale Ins. Co. v. Roumph</u>, 211 F.3d 964, 967-68 (6th Cir.2000)(Factors to be considered in determining whether to exercise discretion to hear a declaratory judgment claim are: 1) whether the judgment would settle the controversy; 2) whether the declaratory judgment action would serve a useful purpose in clarifying the legal relations at issue; 3) whether the declaratory remedy is being used merely for the purpose of "procedural fencing" or "to provide an arena for a race for res judicata;" 4) whether the use of a declaratory action would increase the friction between our federal and state courts and improperly encroach on state jurisdiction; and 5) whether there is an alternative remedy that is better or more effective)).

B.  <u>The Standards for Considering Summary Judgment</u>

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment may

be rendered if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed.R.Civ.P. 56(c); Meyers v. Columbia/HCA Healthcare Corp., 341 F.3d 461, 466 (6th Cir. 2003).

In order to prevail, the movant has the burden of proving the absence of a genuine issue of material fact as to an essential element of the opposing party's claim. Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).  In determining whether the movant has met its burden, the Court must view the evidence in the light most favorable to the nonmoving party. Matsushita Electric Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); Hopson v. DaimlerChrysler Corp., 306 F.3d 427, 432 (6th Cir. 2002).

In order to defeat the motion, the nonmoving party is required to show, after an adequate time for discovery, that there is a genuine issue of fact as to every essential element of that party's case upon which he will bear the burden of proof at trial.  Celotex Corp., 106 S.Ct. at 2553; Meyers, 341 F.3d at 466.  To create a genuine factual issue, the nonmoving party must show "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).  Although the nonmovant need not show that the disputed issue should be resolved in his favor, he must demonstrate that there are genuine factual issues that "properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  Id.  See also Hopson, 306 F.3d at 432.

A preponderance of the evidence standard is used in this determination. Id.  Therefore, if

13

the evidence offered by the nonmoving party is "merely colorable," or "is not significantly probative," the motion for summary judgment may be granted. Id.  See also Matsushita Electric, 106 S.Ct. at 1356.

C.  Federal and State Law on Third Party Liability for Medicaid Payments

In enacting the various statutes related to the Medicaid program over the years, Congress has made clear its intent that Medicaid be the "payor of last resort."  Congress specifically requires that states administering a Medicaid plan "take all reasonable measures to ascertain the legal liability of third parties (including health insurers, group health plans, . . . service benefit plans, and health maintenance organizations) to pay for care and services available under the plan. . ." 42 U.S.C. § 1396a(25).  To further this purpose, Congress has enacted a provision permitting states to require that Medicaid beneficiaries assign their rights to the state for payment for medical care by third parties:

> (a) for the purpose of assisting in the collection of medical support payments and other payments for medical care owed to recipients of medical assistance under the State plan approved under this subchapter, a State plan for medical assistance shall –
>> (1) provide that, as a condition of eligibility for medical assistance under the State plan to an individual who has the legal capacity to execute an assignment for himself, the individual is required –
>>> (A)  to assign the State any rights of the individual . . . to payment for medical care from any third party;

42 U.S.C. § 1396k(a). See also 42 U.S.C. § 1396a(45)(state Medicaid plans must provide for mandatory assignment of rights of payment for medical support and other medical care owed to recipients).  Regulations implementing the Medicaid statutes also provide for assignment of rights, and recovery reimbursement from liable third parties. See 42 C.F.R. § 433.135(a)(1)(As a condition of eligibility, each Medicaid applicant is required to assign rights to medical support

14

and payment to state Medicaid agency); 42 C.F.R. § 433.139 (State Medicaid agency is required to seek reimbursement from liable third party).

This assignment of rights is also recognized by the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001, *et seq.* ("ERISA"), which provides that a group health plan "shall provide that payment for benefits with respect to a participant under the plan will be made in accordance with any assignment of rights made by or on behalf of such participant . . . as required by a State plan for medical assistance approved [under the Medicaid statutes]." 29 U.S.C. § 1169(b)(1). See also 29 U.S.C. § 1169(b)(3)("A group health care plan shall provide that, to the extent that payment has been made under a State plan for medical assistance . . . in any case in which a group health plan has a legal liability to make payment . . . payment for benefits under the plan will be made in accordance with any State law which provides that the State has acquired the rights with respect to a participant to such payment . . . ")

ERISA also contemplates a state's pursuit of reimbursement in connection with its preemption provisions. With certain exceptions, ERISA preempts any and all state laws relating to employee benefit plans subject to Title I of the Act. 29 U.S.C. § 1144(a). Subsection (b)(8) provides, however, that the preemption provision does not apply:

> (A) with respect to which the State exercises its acquired rights section 1169(b)(3) of this title with respect to a group health plan . . . , or
>
> (B) for recoupment of payment with respect to items or services pursuant to a State plan for medical assistance [approved under the Medicaid statutes] which would not have been payable if such acquired rights had been executed before payment with respect to such items or services by the group health plan.

29 U.S.C. § 1144(b)(8).

Congress has also made clear that private insurers are not to use insurance contract

15

provisions to discriminate against Medicaid or Medicaid beneficiaries. 42 U.S.C. § 1396b(o)(". . . no payment shall be made to a State . . . to the extent that a private insurer . . . would have been obligated to provide such assistance but for a provision of its insurance contract which has the effect of limiting or excluding such obligation because the individual is eligible for or is provided medical assistance under the plan.")    See also 29 U.S.C. § 1169(b)(2)(Group health plans are to enroll and pay benefits to participants without regard to a person's eligibility for Medicaid benefits.)

As required by these federal statutes, the State of Tennessee has provided for assignment of rights by recipients and recovery of reimbursement from liable third parties. Tennessee Code Annotated Section 71-5-117(b) provides, in part:

> (b) Upon accepting medical assistance, the recipient *shall be deemed to have made an assignment* to the state of the right of third party insurance benefits to which the recipient may be entitled. . . .

The statute also provides subrogation rights to the state. Tenn. Code Ann. § 71-5-117(a). Regulations governing the Tennessee Medicaid program, TennCare, provide for "direct billing" of third parties by the state Medicaid agency to collect or recover payments for covered services. Tenn.Comp.R.&Regs. 1200-13-1-.04 (1)(c), (6).

D.  Caremark's Plan Restrictions

Although Caremark acknowledges that Medicaid, or TennCare in this case, is to be the payor of last resort, it contends that TennCare may not recover benefits on behalf of plan participants who are subject to the following restrictions: the "card presentation" restriction; the "paper claims" restriction; the "timely filing" restriction; and the "out-of-network" restriction.

The "card presentation" restriction requires that a participant identify himself or herself

16

as a plan participant at the point of sale. Failure to do so results in rejection of any claim for reimbursement. Failure to present a Caremark card may occur because the recipient is unaware of his private coverage, or because TennCare may provide for a lower co-payment than the recipient's health insurance plan. In any event, TennCare is required to pay for the participant's prescriptions, and then seek reimbursement from the insurance plan when it discovers plan coverage. Caremark argues that it is not liable to TennCare for payment of the prescriptions because the participant has failed to comply with the card presentation requirement, and TennCare steps into the shoes of the participant. In seeking recovery for these claims, TennCare cannot comply with the card presentation requirement because it is unaware of third-party coverage until after the point of sale (assuming it had a card to present).

The "paper claim" restriction is similar in that the plan does not pay, or pays a reduced benefit, for claims requesting payment after the point of sale, presumably sent to the provider on a claim form with an attached receipt. According to the State, Caremark has taken the position that TennCare requests for reimbursement are "paper claims" and refuse payment, or pay a reduced benefit.[2] Caremark contends that the "card presentation" requirement and the "paper claim" restriction are one and the same. The Court will assume the restrictions are the same as any differences are not relevant to the Court's decision.

The "timely filing" restriction relates to the maximum number of days that a plan participant has to file a claim for reimbursement from the date a prescription is filled by a pharmacy. Caremark has applied this restriction to reject TennCare requests for reimbursement

_____

[2]   The State points out that these requests are actually sent to Caremark in large electronic files.

17

for payments made to the plan participant at the point of sale.

Caremark's Complaint has also raised the issue of whether it is required to reimburse TennCare for prescriptions obtained by a plan participant at an out-of-network pharmacy. The State indicates in its brief that it agrees that TennCare's reimbursement is limited to the coverage applicable to the plan participant at the point of sale. (Defendants' Memorandum Of Law In Support Of Motion For Summary Judgment, at 25 n. 8 (Docket No. 69)).[3] In other words, reimbursement for a prescription filled by a participant whose plan provides for no coverage or limited coverage for prescriptions filled at an out-of-network pharmacy would be limited to that plan's coverage. The United States' position appears to be the same. (Memorandum In Support Of United States' Motion For Summary Judgment Or, In The Alternative, to Dismiss Or Transfer, at 22 (Docket No. 81)("Even if a Medicaid beneficiary does not use a Caremark pharmacy because she is unaware of Caremark coverage or finds it convenient to go elsewhere, in such a circumstance Caremark would be required to reimburse Medicaid the amount due had the drug been obtained from an out-of-network pharmacy.")). Thus, the parties appear to agree as to the effect of the out-of-network restriction on TennCare reimbursement, and the Court concludes that it is unnecessary to opine on this issue.[4]

E. Assignment of Rights

Caremark argues that these restrictions can be applied to TennCare claims because

_____

[3] The State indicates that it agrees to this limitation based on the opinion of the Centers for Medicare and Medicaid Services set forth in a letter dated January 19, 2005, discussed below.

[4] In any event, application of the Court's reasoning regarding the other restrictions would result in the same conclusion.

Case 3:04-cv-01112   Document 107   Filed 10/18/05   Page 18 of 23 PageID #: 801

TennCare's reimbursement rights arise only after it has made payment to the plan participant, and that it stands in the shoes of the participant as of the time payment has been made under traditional subrogation law principles. On the other hand, the State of Tennessee, the Department of Labor[5], and the Center for Medicare and Medicaid Services in the Department of Health and Human Services ("CMS")[6], take the position that the State's right to reimbursement arises at the time the participant initially requests covered goods and services, and that this right is not limited by plan restrictions that apply to the participant after the original transaction. In other words, the health insurer remains liable for covered goods or services to the same extent that it would have been if billed at the point of sale.

The Court concludes that the position of the government defendants is most consistent with the relevant statutory authority set forth above. The language of the Tennessee statute provides that upon receiving medical assistance, or payment for the cost of goods or services, the TennCare beneficiary "shall be deemed to have made" an assignment of rights to the State. Tenn. Code Ann. §§ 71-5-117(b); 71-5-103(5). The Court is not persuaded by Caremark's insistence

---

[5]   The Department of Labor has opined that ERISA preemption does not apply to state laws permitting reimbursement "to the extent that the plan would have been liable to any third party, including the participant or the pharmacist, for those expenses when the drug was dispensed (that is before the State made the payments)." (Letter dated March 23, 2005, from John J. Canary, Employee Benefits Security Administration of the Department of Labor to Patrick J. O'Connell, Civil Medicaid Fraud Section of the Office of the Attorney General of Texas, at 3 (Attached to Defendants' Notice of Filing (Docket No. 71)).

[6]   CMS is the central federal agency that administers the Medicaid program. See Rosen v. Goetz, 410 F.3d 919, 927 (6th Cir. 2005). As noted above, CMS has issued a "Fact Sheet" which states that a plan's obligation to honor an assignment of benefit rights arises at the time the plan participant requests covered goods or services. (Letter dated January 19, 2005 to Caremark from the Centers for Medicare and Medicaid Services (attached to Defendants' Notice of Filing (Docket No. 71)).

that the term "assign" requires that the conveyance of the beneficiary's rights take place *after* payment by the State. Assuming subrogation law principles under state common law would require such a result, the Court concludes that those principles are not applicable to this statutory assignment of rights.[7] Given the intent of the drafters of the Medicaid statutes, clearly expressed in those statutes, and the language of Tennessee Code Annotated Section 71-5-117(b), the Court finds that this statutory assignment of rights occurs at the time the beneficiary requests covered goods or services.

Deeming the assignment of the beneficiary's right to payment under a policy to occur at the time the beneficiary requests goods or services does not convey to TennCare any greater rights than the beneficiary has under the policy. Substantive coverage limitations would still apply. This construction simply prevents insurance plans from erecting "procedural" roadblocks to reimbursement that are inconsistent with the anti-discrimination policies set forth in the statutes governing Medicaid.[8]

In making the argument that TennCare's "assignment" rights take place *after* payment is made, Caremark principally relies on decisions by a district court in California and a district court in Michigan. In Belshe v. Laborers Health and Welfare Trust Fund for Northern

---

[7]  Caremark suggests that an "assignment" and "subrogation" are one and the same under Tennessee law. Although similar, Tennessee courts have noted a distinction. See, e.g., Wilson v. Tennessee Farmers Mut. Ins. Co. 219 Tenn. 560, 565, 411 S.W.2d 699, 701 (Tenn. 1966)("Subrogation means substitution, not assignment or transfer. Subrogation operates only to secure contribution and indemnity; whereas, an assignment transfers the whole claim.")

[8]  The Court notes that an independent right of recovery, unrestricted by state law subrogation principles, has been recognized in the Medicare context. See, e.g., U.S. v. York, 398 F.2d 582, 584 (6th Cir. 1968); Provident Life and Accident Insur. Co. v. United States, 740 F.Supp. 492 (E.D. Tenn. 1990).

<u>California</u>, 876 F.Supp. 216 (N.D. Cal. 1994), a district court in Northern California ruled that

ERISA preempted a California statute, which stated:

> Each publicly funded health care program that furnishes or pays for health care services under this division to a person having private health care coverage shall be entitled to be surrogated to the rights that such person has against the carrier of such coverage to the extent of the health care services rendered. Such action may be brought within three years from the date that service was rendered such person.

876 F.Supp. at 220 (citing Cal.Welf.& Inst.Code § 10022).  The California district court ruled

that Section 514(b)(8) of ERISA could not save the California statute from preemption because

the language of the statute does not allow the state to "acquire greater rights than the

beneficiaries have." 876 F.Supp. at 221.[9]

The most basic reason for rejecting this case as persuasive authority here is that, unlike

Tennessee Code Annotated Section 71-5-117(b), the language of the California statute at issue in

<u>Belshe</u> does not use the term "assign" or specify when the assignment takes place.  In addition,

the Court disagrees with the California district court's characterization of the state's acquired

rights as being "greater" than the beneficiary.  If measured at the point of sale, the state is not

entitled to any more insurance coverage than the beneficiary.  In any event, the Court is not

persuaded by the California district court's broad application of ERISA preemption, which

ignores the language of the Medicaid statutes manifesting the intent of Congress that Medicaid

be the payor of last resort.

The Court notes that the Department of Labor, charged with enforcement of these ERISA

---

[9]  In reaching its opinion, the court also stated that the state had failed to demonstrate that the three-year period set forth in the statute for seeking recovery "is necessary to achieving the Medicaid requirement of pursuing reimbursement from third party insurers." 876 F.Supp. at 222.  Consequently, according to the court, the state failed to show that the enactment was necessary for the enforcement of federal laws under Section 514(d) of ERISA. <u>Id.</u>

provisions, also disagrees with the analysis of the Belshe court. (Letter dated March 23, 2005, from John J. Canary, Employee Benefits Security Administration of the Department of Labor to Patrick J. O'Connell, Civil Medicaid Fraud Section of the Office of the Attorney General of Texas, at n.4 (Attached to Defendants' Notice of Filing (Docket No. 71)).

Caremark also relies on Michigan Department of Social Services v Shalala, 859 F.Supp. 1113 (W.D. Mich. 1994), in which a district court for the Western District of Michigan held that the state Medicaid agency could not obtain reimbursement from Medicare for benefits paid to beneficiaries for skilled nursing care. The Michigan statute at issue provided that the state Medicaid agency "shall be subrogated to any right of recovery which a patient may have for the cost of hospitalization. . . " 859 F.Supp. at 1117 (citing M.C.L. § 400.106(1)(b)(ii)). In discussing various procedural issues raised by the case, the court stated that a claim-filing deadline imposed by federal law would be applied to requests for reimbursement by the state Medicaid agency "as subrogee." 859 F.Supp. at 1121. The court went on to conclude, however, that there had been no "claim by claim assessment of timeliness," and therefore remand for this determination was necessary. Id.

As the statute in the Michigan case mentions only subrogation rights, and since the restriction at issue (a filing deadline) was imposed by federal law, rather than by contract, the Court finds this case distinguishable and unpersuasive on the issues presented here.

In conclusion, the Court holds that the statutory assignment of rights from the TennCare beneficiary to the State under Tennessee Code Annotated Section 71-5-117(b) occurs at the time the beneficiary requests covered goods or services. Thus, the "card presentation," "paper claims," and "timely filing" restrictions set forth in a beneficiary's health insurance plan do not

22

apply to TennCare's request for reimbursement from the insurer.

Although the Court concludes that the Defendants' position is more persuasive, the dispute between the parties is based on a good faith disagreement about a complex area of the law.

IV. <u>Conclusion</u>

For the reasons set forth herein, the Defendants' motions for summary judgment are granted, and the Plaintiff's motion is denied.

It is so ORDERED.

_____
TODD J. CAMPBELL
UNITED STATES DISTRICT JUDGE